# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| SHAKENNA CLOTTER, as administrator of the ESTATE OF AMARION CLOTTER, and A.C., a minor, by and through SHAVONIE HEFLIN, | |
| | Civil Action File No. |
| Plaintiffs, | 1:24-cv-4543-ELR |
| v. | |
| GEORGIA DEPARTMENT OF PUBLIC SAFETY, | **JURY TRIAL DEMANDED** |
| Defendant. | |

## PLAINTIFFS' FIRST AMENDED COMPLAINT[1]

Plaintiffs Shakenna Clotter, as administrator of the Estate of Amarion Clotter, and A.C., a minor, by and through his mother Shavonie Heflin, file this Complaint pursuant to the Georgia Tort Claims Act ("GTCA"), O.C.G.A. § 50-21-20, *et seq.*

---

[1] This amended complaint is pursuant to Rule 15(a)(2) because counsel for Defendants consented to same.

This amendment dismisses the federal claims and any claims against Defendant Tarpley without prejudice. *See May v. Am. Cast Iron Pipe Co.*, No. 2:12-CV-0285-SLB, 2014 WL 1043440, at *1 n.2 (N.D. Ala. Mar. 17, 2014) ("Plaintiff's failure to include [prior] claims in his amended [c]omplaint operates as a voluntary dismissal of these claims.").

## INTRODUCTION

1.      On September 30, 2022, the day he died, Amarion Clotter was 18 years old. He was a backseat passenger in a car. The other passenger was a friend being taken the hospital. The driver of the car was travelling at a common speed on I-75/85 but allegedly above the 55 miles per hour limit. An officer decided to initiate a traffic stop. Law enforcement had no other information other than a speeding violation to justify a stop. For unknown reasons, the driver failed to pull over. The driver left the interstate at the exit for the hospital. Seeing that the driver was not going to stop, despite their pleading, Clotter and the friend opened their doors to get out. The friend jumped out of the moving vehicle and immediately surrendered. Clotter was not able to get out. The driver got back on the interstate. Almost immediately, a Georgia State Trooper executed a PIT maneuver that launched the vehicle up an embankment, over ten feet into the air across an interstate entrance, and into trees and a wall.

2.      Amarion Clotter died. His death was unimaginably terrifying and horrific. And it happened for no good reason. This is his family's effort to obtain accountability and justice.

3.      In short, Plaintiffs allege that the Georgia Department of Public Safety, via its officers, were negligent in their actions and inactions leading to

Clotter's death in ways that give rise to liability under the Georgia Tort Claims Act. They violated the express terms of DPS policies 10.01 and 17.02, among perhaps others. Plaintiffs do not challenge the policies themselves, only officers' departures therefrom.

## PARTIES

4.      Plaintiff Shakenna Clotter is an adult resident citizen of the State of Georgia. She is Amarion Clotter's mother and has been appointed administrator of the Estate of Amarion Clotter. *See In re Estate of Amarion*, Fulton County Probate Court, Estate No. PC-2024-000924. As administrator of the Estate of Amarion Clotter, she has the right to recover "the full value of the life" of Amarion Clotter, pursuant to O.C.G.A. § 51-4-5.

5.      Plaintiff A.C. is Amarion Clotter's two-year-old son and next of kin. He brings this action by and through his mother Shavonie Clotter.

6.      Defendant Georgia Department of Public Safety is a state government entity of the State of Georgia, and pursuant to O.C.GA. § 50-21-35, Defendant shall be served with process through its chief executive officer, Commissioner Lt. Col. William W. Hitchens, III, at his usual office address of Georgia Department of Public Safety, Department Headquarters, 959 United Avenue SE, Atlanta, GA 30316, and through the Director of Risk Management Services for the Georgia Department of Administrative

Services, Wade Damron, at his usual office address of Risk Management

Services, Georgia Department of Administrative Services, 200 Piedmont

Avenue SE, Suite 1208, West Tower, Atlanta, Georgia 30334.

## JURISDICTION AND VENUE

7.       Pursuant to O.C.G.A. § 50-21-20, *et seq.*, this Court has subject

matter jurisdiction over the claims alleged herein.

8.       Plaintiffs have complied with the provisions of O.C.G.A. § 50-21-

26(a), providing, by letter September 18, 2023, initial notice of their claim to

the Risk Management Division of the Georgia Department of Administrative

Services (hereinafter, "DOAS") by way of statutory overnight delivery, return

receipt requested, as evidenced by a copy of said notice, together with a copy

of the delivery receipt for said notice, attached hereto.

9.       Plaintiffs, in further compliance with the provisions of O.C.G.A.

§ 50-21-26(a), by letter addressed as instructed by Defendant and dated

September 18, 2023, provided notice of their claim, identified their losses,

and demanded payment for said losses by way of statutory overnight

delivery, return receipt requested, to the Georgia Department of Public

Safety, as evidenced by a copy of said notice, together with a copy of the

delivery receipt for said notice, attached hereto.

10.    Prior to filing this Complaint, in accordance with the requirements of O.C.G.A. § 50-21-26(b), Plaintiffs waited 90 days, in which time no one granted or denied the notice of claim. DOAS confirmed receipt of the letter and stated than an investigation was ongoing via October 30, 2023 correspondence.

11.    In accordance with O.C.G.A. § 50-21-35, a copy of the original complaint, showing the date of filing, has been mailed to the Georgia Attorney General, the Honorable Christopher Carr, by way of statutory overnight delivery, return receipt requested, to his usual address of Office of the Attorney General, 40 Capitol Square, SW, Atlanta, Georgia 30334, and a certificate attesting to said mailing is attached hereto.

12.    Pursuant to O.C.G.A. § 50-21-28, venue is proper in the State Court of Fulton County as Defendant Department of Public Safety is located in Fulton County and because the tort giving rise to the loss occurred in Richmond County.

**FACTS**

13.    On September 30, 2022, Amarion Clotter got into the backseat of a Jeep Cherokee driven by Broderick Dunn to get Clotter's friend, Montavious Lovejoy, to the hospital emergency department.

14.    Dunn had lawfully rented the vehicle.

15. The vehicle had not been reported stolen.

16. Lovejoy was in the front passenger seat.

17. Clotter was in the rear driver's side seat.

18. Dunn drove north on Interstate 75/85 to get Lovejoy to Grady Memorial Hospital.

19. Given the time of day, traffic was very light.

20. According to one Department of Public Safety official, Dunn was travelling in excess of the speed limit of 55 miles per hour.

21. But Dunn's speed was not inconsistent with other vehicles and did not present an imminent safety concern given the traffic conditions.

22. A DPS officer attempted a traffic stop of the Jeep driven by Dunn.

23. The only reason for initiating the traffic stop in the first instance was speed.

24. No law enforcement official had any information that the vehicle was stolen, that there were criminals inside the vehicle, that there were weapons or contraband in the vehicle, that the driver was impaired, or that any felony had been committed.

25. An officer observed the plate and reported it to dispatch with negative results for any theft or warrants.

26.    For unknown reasons, Dunn did not just pull over.

27.    Clotter and Lovejoy pleaded with Dunn to stop.

28.    Dunn was on the phone with his family, who also told him to stop.

29.    Dunn exited at Edgewood, to get to Grady.

30.    Dunn slowed down, but never stopped at the intersection of the interstate egress and Edgewood.

31.    Lovejoy opened the front passenger door and jumped out of the moving vehicle.

32.    Lovejoy did not flee, resist, or pose any threat to law enforcement.

33.    He was unarmed and eventually taken to Grady.

34.    Clotter opened the rear driver's side door to escape from the moving vehicle in which he was an involuntary occupant.

35.    But Dunn never stopped or slowed enough to escape without risking serious bodily harm, so Clotter was unable to escape.

36.    Multiple DPS officers, including Sgt. Scott Tarpley, the officer who performed the PIT maneuver, observed that a passenger in the backseat attempted to escape but could not do so.

37.    Dunn got back on the interstate at Edgewood, this time heading south.

38.    Dunn took the exit for Interstate 20 heading east.

39.    Dunn drove at approximately 95 miles per hour, but traffic remained light.

40.    At no time did Dunn attempt to make contact, or come close to making any contact, with any other vehicle.

41.    Tarpley made contact with the Jeep to get the vehicle to come to a sudden uncontrolled crash near the entrance ramp from Hill Street onto Interstate 20 east.

42.    The Jeep became uncontrolled.

43.    The Jeep launched up the embankment at the Hill Street entrance ramp, left the ground, and crashed into the tree line and wall behind the trees.

44.    Clotter suffered injuries, to which he eventually succumbed.

45.    Dunn was also killed in the crash.

46.    The Fulton County Medical Examiner ruled that Clotter's death was a homicide, rather than an accident.

47.     According to the rules governing medical examiner's classification of deaths, a homicide designation requires the conclusion that there was "a volitional act committed by another person to cause fear, harm, or death."

48.     The medical examiner determined Clotter's cause of death to be subtotal amputation of the right leg, with open left femur fractures, blunt impact trauma to the head with associated hemorrhage, and blunt impact trauma to the chest and torso with lung contusions and pelvic hemorrhage.

49.     Clotter's death was almost certain to occur when the vehicle was induced to come to a sudden uncontrolled stop at the speed at which it was travelling.

<u>*Breaches of DPS Policy*</u>

50.     DPS personnel should have been well aware of DPS' policy for deadly force in the pursuit context because, according to POST records, he took a four-hour course on the subject two days prior to his use of deadly force on Dunn and Clotter.

51.     But DPS personnel flagrantly departed from DPS policy, as well as generally applicable police guidelines.

52.     According to DPS policy, DPS personnel's actions in making contact with the vehicle to bring it to a sudden uncontrolled stop amounted to deadly force.

53.     DPS defines deadly force as "force that has a reasonable probability of causing death."

54.    In the pursuit context, DPS has an even broader definition of deadly force, as the "application of any instrument that is likely to produce death or serious physical injury under the circumstances of its use."

55.    The DPS deadly force policy specifically contemplates the obvious, that automobiles can be instruments of deadly force.

56.    DPS personnel's actions were obviously deadly force because causing a sudden uncontrolled crash when a vehicle is travelling at 95 miles per hour is likely to cause death.

57.    Any lay person would know that death was likely in causing an uncontrolled crash at that speed.

58.    The obvious likelihood of death was all the more apparent to trained DPS personnel.

59.    And, of course, both occupants of the vehicle were killed, suffering multiple injuries that were sufficient to cause death.

60.    DPS' pursuit policy states that deadly force cannot be used in the pursuit context unless it is justified by the deadly force policy.

61.    Deadly force was very clearly not permitted against Clotter, the backseat passenger, and involuntary occupant, in the vehicle being pursued.

62.    DPS personnel had no information that Clotter was a suspected felon (or even a misdemeanor suspect).

63.    In fact, Clotter was an innocent passenger on the way to the emergency room, when Dunn refused to pull over.

64.    DPS personnel had no information that Clotter had a deadly weapon.

65.    In fact, Clotter had no weapon.

66.    DPS personnel had no information that Clotter posed an immediate threat of violence.

67.    In fact, Clotter was attempting to exit the vehicle or persuade the driver to pull over.

68.    DPS personnel had no information that Clotter had committed a crime involving the infliction, or threatened infliction, of serious physical harm.

69.    In fact, Clotter had been attempting to get a friend to the emergency room and did not pose a danger to anyone.

70.    Absent a reasonable belief that Clotter was a suspected felon who was armed, immediately dangerous, or had recently committed a violent crime, DPS personnel wer categorically prohibited from using deadly force under DPS policy.

71.    Similarly, there were no facts that would allow deadly force under the policy as against Dunn.

72.    At most, Dunn was wanted for a misdemeanor speeding offense. It is hard to imagine a lesser offense in the pursuit context.

73.    In addition to the violations of the prohibitions on deadly force, DPS personnel breached other duties imposed by the policy.

74.    DPS personnel failed to exercise "due regard" as required by the policy, as will be shown by expert testimony.

75.    DPS personnel failed to consider the mandatory factors to be considered in the decision to cause a sudden uncontrolled crash, all of which pointed against the use of deadly force.

76.    DPS personnel failed to appreciate that the suspected offense, speeding on the connector at a time with light traffic, was a minor offense.

77.    DPS personnel failed to appreciate that the car was not stolen and the plates had been positively identified so that Dunn could be apprehended.

78.    DPS personnel failed to appreciate that traffic conditions were as light as possible in the area given the time of day.

79.    DPS personnel failed to consider that there was no evidence of a felony.

80.    DPS personnel failed to consider that there was no information that Dunn showed a total disregard for public safety, no information that he

had violated any traffic control devices, no information that he had darted at other vehicles, no information that he had driven on the wrong side of the road, and no information that he had run any other motorist off the road.

81.     In fact, Dunn had done none of those things.

82.     DPS personnel failed to understand that they had an obligation to avoid contributing to the danger that has already been created by the violating motorist.

83.     DPS personnel failed to understand that every violator will not be apprehended, as is required by the policy.

84.     DPS personnel failed to consider training and experience showing that fleeing suspects slow down once they are no longer being pursued.

85.     DPS policy requires alerts over the radio about various conditions, including use of firearms or force, any observed danger to public safety, and options for terminating pursuit other than causing a sudden uncontrolled crash.

86.     There were no alerts over the radio, and no circumstances giving rise to giving any alerts, about firearms or force or any observed danger to public safety.

87.     There was none of the required discussion about options for terminating pursuit other than causing a sudden uncontrolled crash.

88.     DPS policy requires that terminating a pursuit by causing a sudden uncontrolled crash can only be used after other methods for stopping a fleeing vehicle have been considered and determined to not be feasible.

89.     DPS personnel failed to consider these alternatives.

90.     These alternatives were feasible.

91.     DPS personnel knew that one DPS officer did not want to be in a position to cause a sudden uncontrolled crash because he was concerned about the safety of his K9 and "did not want to subject the canine to a" crash.

92.     But other DPS personnel, led by Tarpley, had no problem subjecting an innocent passenger to a far more severe crash.

93.     In the alternative, DPS personnel did not know that there was a backseat passenger who attempted to exit the vehicle, even as they should have known that fact and other officers should have communicated that fact. The failure to perceive the obvious or for other officers to communicate their observations about a passenger constitutes a breach of DPS policy.

94.     In sum, DPS personnel negligently executed DPS' policies on pursuit and deadly force in ways that led to the death of Amarion Clotter.

<u>*Falsified Reporting to Insulate Review of Wrongdoing*</u>

95.    After DPS personnel caused a crash that killed two young men, one of whom was suspected of speeding and one of whom was suspected of nothing, DPS undertook a self-investigation.

96.    The investigation was undertaken to insulate the improper use of deadly force from scrutiny.

97.    The investigation sought to justify the use of deadly force on Clotter based on falsehoods and facts that were not known at the time of the use of force.

98.    For example, the report falsely stated that Clotter was the driver of the vehicle.

99.    That was just not true, and it was obviously not true.

100.    Lovejoy stated that Clotter was the backseat passenger, but that information was omitted from the report.

101.    A woman had rented the vehicle to Dunn—not Clotter—and she told as much to law enforcement. But that information did not make it into the report.

102.    During the pursuit, Dunn was on the phone with his family, who urged him to pull over. That information did not make it into the report.

103.   Before the pursuit, Shakenna Clotter observed her son get into the backseat of the vehicle. That information did not make it into the report.

104.   During the pursuit, Shavonie Heflin observed a video of Clotter in the backseat of vehicle. That information did not make it into the report.

105.   The report also attempted to use information that was not known, or knowable, to law enforcement at the time of the use of force to justify the use of force.

106.   However, none of that information related to any misconduct of Clotter or anything that might have justified any seizure of Clotter.

## COUNT ONE
### *Negligence*
### *Georgia Tort Claims Act and O.C.G.A. § 40-6-6*

107.   Pursuant to O.C.G.A. §§ 50-21-23 and 50-21-24, the Georgia Department of Corrections is liable for the negligence of its officials.

108.   Georgia Department of Public Safety officials owed a duty to Clotter to not use deadly force against him without justification.

109.   Department of Public Safety officials, including Tarpley, violated mandatory policies and failed to exercise due regard.

110.   Their actions were not permitted by policy.

111.   As an obvious and direct result of the actions and inactions of Georgia Department of Public Safety officials, including Tarpley, Clotter died from being subjected to a sudden, uncontrolled crash.

112.   Before he died, Clotter suffered in ways that are hard to imagine.

113.   Clotter's life was valuable, in ways both economic and non-economic.

## COUNT TWO
### *Expenses of Litigation under O.C.G.A. § 13-6-11*

114.   Plaintiffs are entitled to recover expenses personally of litigation under O.C.G.A. § 13-6-11 because Defendant has acted in bad faith, been stubbornly litigious, and caused Plaintiffs unnecessary trouble and expense.

WHEREFORE, Plaintiffs demand:

a) That this Complaint be filed and served as provided by law;

b) That Plaintiffs receive a judgment in their favor in the amount of the limit imposed by O.C.G.A. § 50-21-29, as their losses exceed those figures;

c) That Plaintiffs be awarded attorneys' fees and other costs of litigation, pursuant to e.g., O.C.G.A. § 13-6-11;

d) That all costs of this action be cast upon the Defendant; and

e) That Plaintiffs receive such other and further relief as the Court

deems just and proper.

Respectfully submitted this the 6th day of November, 2024.

/s/ Zack Greenamyre
Zack Greenamyre
Georgia Bar No: 293002

MITCHELL SHAPIRO GREENAMYRE & FUNT, LLP
881 Piedmont Avenue
Atlanta, GA 30309
(404) 812-4747
(404) 812-4740-Facsimile
zack@mitchellshapiro.com



**Direct** (404) 812-4751
zack@mitchellshapiro.com

September 18, 2023

**VIA FEDERAL EXPRESS
AND VIA CERTIFIED MAIL
RETURN RECEIPT REQUESTED**

Department of Administrative Services      Department of Public Safety
Risk Management Division                  c/o Commissioner Christopher C. Wright
200 Piedmont Avenue                       959 United Avenue S.E.
Suite 1208, West Tower                    Atlanta, GA 30316 (FedEx)
Atlanta, Georgia 30334                    P.O. Box 1456
                                          Atlanta, GA 30371 (US Mail)

Georgia State Patrol
959 United Avenue S.E.
Atlanta, GA 30316 (FedEx)
P.O. Box 1456
Atlanta, GA 30371 (US Mail)

| | |
|---|---|
| Re: | Notice of Claim pursuant to O.C.G.A. § 50-21-26, *et seq.*; Claims by family of Mr. Amarion Clotter for violations of policy, statute, and negligence causing death |
| Date of Loss: | August 30, 2022 at approximately 1:00am |
| Claimant: | Shavonnie Heflin as next friend of A.C., the infant child of Amarion Clotter, and Shakenna Clotter, as anticipated administrator of the Estate of Amarion Clotter |
| Location: | City of Atlanta (I-20 Eastbound, near the entrance ramp from Hill Street at Exit 58A) |

Dear Risk Management Division and Commissioner Wright:

Our firm represents the family of Amarion Clotter in connection with their claims for their loved one's wrongful death.

This notice is presented to the State of Georgia pursuant to O.C.G.A. § 50-21-26(a)(5). In accordance with that provision, this notice is being presented to the State of Georgia and the Department of Public Safety and/or the Georgia State Patrol, which are the government entities that the above claimants assert are responsible, jointly and/or concurrently, with the acts and omissions of any others, for the wrongful death of Amarion Clotter. Consistent with the Georgia Tort Claims Act, the following is provided to the extent of claimants' knowledge and belief.

**(A)    The name of the state government entity, the acts or omissions of which are asserted as the basis of the claim:**

The Department of Public Safety and/or the Georgia State Patrol are the state government entity or entities whose officials, agents, and employees committed the acts and omissions that form the basis of the claims asserted.

**(B)    The time of the transaction or occurrence out of which the loss arose:**

Amarion Clotter was killed via a PIT maneuver at approximately 1:00am on the morning of September 30, 2022. The PIT maneuver and the resulting crash occurred between 12:50am and 1:00am, and it is believed that Clotter died shortly thereafter.

**(C)    The place of the transaction or occurrence:**

The death occurred within the City of Atlanta on the side of I-20 Eastbound, near the entrance ramp from Hill Street and/or Glenwood Ave at Exit 58A, as more specifically identified and diagrammed in SCRT Case Analysis Report for Case No. SCRTC-105-22.

**(D) The nature of the loss suffered:**

The nature of the loss suffered includes the following: the wrongful death of Amarion Clotter, by injuries resulting from a traumatic car crash; the full value of his life; the fright, shock, and mental suffering of Mr. Clotter; mental and physical pain and suffering of Mr. Clotter; punitive damages; attorney fees, costs, and expenses; any other damages as may be lawfully authorized which arise out of the above-described transaction or occurrence, including those that may become apparent through the discovery process.

**(E)    The amount of the loss claimed:**

The amount of the loss claimed is $3,000,000.

**(F)    The acts or omissions which caused the loss:**

The acts and omissions which caused the loss include the following:

Sargent Scott Tarpley (#943) unlawfully used deadly force on Amarion Clotter who was a backseat passenger of a suspected speeder. More specifically, Sgt. Tarpley executed a PIT maneuver on a vehicle travelling in excess of the speed limit

on Interstate 20 within the City of Atlanta that foreseeably led to the death of the two occupants of the vehicle. The original reason for the traffic stop was for speeding (approximately 90 mph in a 55 mph zone). No other crimes, much less any crimes of violence were observed or suspected of anyone—much less Clotter.

Mr. Amarion Clotter was in the backseat of the vehicle that was being driven by Mr. Broderick Dunn. Clotter can be seen in Tarpley's dash camera attempting to get out of the vehicle when it slows down at the underpass of I-75/85 near the intersection of Edgewood Avenue and Fort Street. Passenger Montavious Lovejoy, who exited from the front passenger seat at that point, while the vehicle was in motion, will corroborate that Clotter was a passenger. Lovejoy heard a phone call between Dunn and his family, where the family and Lovejoy and Clotter begged Dunn to stop the vehicle. Clotter's mother, Shakenna Clotter, will also testify that she observed her son get into the backseat of the vehicle being driven by Mr. Dunn. There is also a social media video Amarion Clotter recorded during the chase from the backseat of the vehicle. Furthermore, there are direct connections between Dunn and the rental of the vehicle, but no connections to Clotter and the vehicle.

Tarpley's use of a PIT maneuver, when he knew the vehicle was occupied by someone other than the driver, who he had observed try to exit the vehicle and whom he had no probable cause to believe had committed *any* offense, was an unlawful and unreasonable use of deadly force.

Under DPS Policy 17.02.03(A) and (D), the use of the PIT maneuver at these speeds was deadly force. That use of deadly force was not permitted by Policy 17.02.4(A)(5), which says that deadly force is only permitted when applicable under the Use of Force Policy. That policy, at 10.01.6(A)(2), provides that deadly force is only permitted

(1) to apprehend a suspected felon only when the suspect possesses a deadly weapon or instrument which is likely to result in serious bodily injury;
(2) when the suspect poses an immediate threat of physical violence to others; or
(3) when there is probable cause to believe that the suspect has committed a crime involving serious physical harm.

At the time of the PIT maneuver, Sgt. Tarpley had absolutely no information that the backseat passenger in the vehicle fell into any of the above categories. Accordingly, the use of force violated policy and gives rise to liability under the Georgia Tort Claims Act.

Separately, Sgt. Tarpley, and other State Troopers, violated O.C.G.A. § 40-6-6 because they showed reckless disregard for proper law enforcement procedures in the decision to initiate and continue the pursuit. It is reckless and inappropriate to

initiate and continue a high-speed chase in a downtown area for a speeding violation. Officers had tag information for the vehicle. Once officers observed others in the vehicle, they should have immediately discontinued the pursuit. Instead, Sgt. Tarpley used deadly force.

There is also likely a Fourth Amendment violation from an unreasonable use of force on a passenger. *See Vaughan v. Cox*, 343 F.3d 1323 (11th Cir. 2003).

The information contained herein is meant to practicably state and summarize the facts known and believed by claimants under the circumstances with regard to claims cognizable under the Georgia Tort Claims Act. For additional detail, claimants hereby incorporate SCRT Case Analysis Report for Case No. SCRTC-105-22, although there are multiple significant errors in that document.

## DEMAND

As counsel for claimants, we present the described claim(s) and a settlement demand of $3,000,000.00 (three million dollars), along with notice that our clients intend to bring suit against the Georgia Department of Corrections and its responsible agents, officials, employees after ninety (90) days from the date of this notice, if this matter has not been resolved, in writing, by that date.

This settlement demand is also being made pursuant to the Unliquidated Damages Interest Act found in O.C.G.A. § 51-12-14, and as noted, will remain open for a period of 90 days from receipt of this demand. Because of the decision of the Georgia Court of Appeals in *Resnick v. Pittman*, 203 Ga. App. 835 (1992), we are providing a copy of this letter by certified mail so that the claim pursuant to the Unliquidated Damages Interest Act is properly communicated pursuant to the Statute.

The purpose of this letter is to comply with O.C.G.A. § 50-21-26 and is not intended to and does not by operation of law or waiver, limit our clients' rights to pursue claims for the violation of rights under federal law or the United States Constitution. This letter is not to be construed as legal advice. The Department of Public Safety may seek legal advice of independent counsel of its choosing.

This letter is being presented within twelve months of the event described and will serve as formal ante-litem notice, pursuant to O.C.G.A. § 50-21-26(a)(5). I hereby present the claims for adjustment and request that should you contend the notice is inadequate in any way, factually, procedurally, or otherwise, you bring such contention to my attention in writing promptly as a process of your adjustment. I am ready, willing, and able to work with the State and the Department of Public Safety to provide any additional information in our custody or control should anyone so request. Otherwise, I will assume that you have no

Amarion Clotter Ante Litem
September 18, 2023
Page 5 of 5

objections to the form and substance of this demand as being compliant with
O.C.G.A. § 50-21-26(a)(5).

If you would like to discuss these matters prior to suit, please reach out to us
directly.

Best regards,

*/s/ Zack Greenamyre*

U.S. Postal Service™
CERTIFIED MAIL® RECEIPT
Domestic Mail Only

For delivery information, visit our website at www.usps.com®.

OFFICIAL USE

Certified Mail Fee
$
Extra Services & Fees (check box, add fee as appropriate)
☐ Return Receipt (hardcopy)        $
☐ Return Receipt (electronic)      $
☐ Certified Mail Restricted Delivery $
☐ Adult Signature Required         $
☐ Adult Signature Restricted Delivery $
Postage
$
Total Postage and Fees
$
Sent To    Dept Public Safety
Street and Apt. No., or PO Box No.    c/o Comm'r Wright
City, State, ZIP+4®

Postmark
Here

PS Form 3800, April 2015 PSN 7530-02-000-9047    See Reverse for Instructions

7021 2720 0002 6153 4026
7021 2720 0002 6153 4033

**Direct** (404) 812-4751
zack@mitchellshapiro.com

~~per~~ 18, 2023

Department of Administrative Services
Risk Management Division
200 Piedmont Avenue
Suite 1208, West Tower
Atlanta, Georgia 30334

FEDEX:
7734 4930
5430

Department of Public Safety
c/o Commissioner Christopher C. Wright
959 United Avenue S.E.
Atlanta, GA 30316 (FedEx) 7734 4947 3654
P.O. Box 1456
Atlanta, GA 30371 (US Mail)

Georgia State Patrol
959 United Avenue S.E.
Atlanta, GA 30316 (FedEx) 7734 4942 6637
P.O. Box 1456
Atlanta, GA 30371 (US Mail)

|  |  |  |
|---|---|---|
| Re: | | Notice of Claim pursuant to O.C.G.A. § 50-21-26, *et seq.*; Claims by family of Mr. Amarion Clotter for violations of policy, statute, and negligence causing death |
| Date of Loss: | | August 30, 2022 at approximately 1:00am |
| Claimant: | | Shavonnie Heflin as next friend of A.C., the infant child of Amarion Clotter, and Shakenna Clotter, as anticipated administrator of the Estate of Amarion Clotter |
| Location: | | City of Atlanta (I-20 Eastbound, near the entrance ramp from Hill Street at Exit 58A) |

Dear Risk Management Division and Commissioner Wright:

Our firm represents the family of Amarion Clotter in connection with their claims for their loved one's wrongful death.

This notice is presented to the State of Georgia pursuant to O.C.G.A. § 50-21-26(a)(5). In accordance with that provision, this notice is being presented to the State of Georgia and the Department of Public Safety and/or the Georgia State Patrol, which are the government entities that the above claimants assert are responsible, jointly and/or concurrently, with the acts and omissions of any others, for the wrongful death of Amarion Clotter. Consistent with the Georgia Tort Claims Act, the following is provided to the extent of claimants' knowledge and belief.

## Receipt 1

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Department of Administrative Services
Risk Management Division
200 Piedmont Ave, Suite 1208, West Tower
Atlanta, GA 30334

9590 9402 7008 1225 5792 71

2. Article Number (Transfer from service label)

7021 2720 0002 6153 5139

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
☐ Agent
☑ Addressee

B. Received by (Printed Name)    C. Date of Delivery
9-21-23

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☒ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053    Domestic Return Receipt

## Receipt 2

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

GEORGIA STATE PATROL
P.O. Box 1456
Atlanta, GA 30371

9590 9402 7008 1225 5792 64

2. Article Number (Transfer from service label)

7021 2720 0002 6153 4026

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
☐ Agent
☐ Addressee
X

B. Received by (Printed Name)    C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

SEP 21 2023

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☒ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053    Domestic Return Receipt

## Receipt 3

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Department of Public Safety
C/o Comm'r Christopher C. Wright
P.O. Box 1456
Atlanta, GA 30307

9590 9402 7008 1225 5792 88

2. Article Number (Transfer from service label)

7021 2720 0002 6153 4033

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
☐ Agent
☐ Addressee
X

B. Received by (Printed Name)    C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

SEP 21 2023

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☒ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053    Domestic Return Receipt

## STATE COURT OF FULTON COUNTY
## STATE OF GEORGIA

SHAKENNA CLOTTER, as administrator of the
ESTATE OF AMARION CLOTTER, and
A.C., a minor, by and through SHAVONIE HEFLIN,

      Plaintiffs,

v.

GEORGIA DEPARTMENT OF PUBLIC SAFETY, and
SCOTT TARPLEY, individually,

      Defendants.

Civil Action File No.

_____

**JURY TRIAL
DEMANDED**

## <u>CERTIFICATE REQUIRED BY O.C.G.A. § 50-21-35</u>

Pursuant to O.C.G.A. § 50-21-35, I do hereby certify that on August 30, 2024, the day this action was commenced, I mailed via certified mail, return receipt requested, a copy of the Complaint in this action, showing the date of filing, along with all attachments thereto, to the Attorney General at his usual office address, as follows:

Georgia Attorney General, the Honorable Christopher Carr
Office of the Attorney General
40 Capital Square, SW, Suite 134
Atlanta, Georgia 30334

Respectfully submitted this the 30th day of August, 2024.

<u>/s/ Zack Greenamyre</u>
Zack Greenamyre
Georgia Bar No: 293002

MITCHELL SHAPIRO GREENAMYRE & FUNT, LLP
881 Piedmont Avenue
Atlanta, GA 30309
(404) 812-4747
zack@mitchellshapiro.com

MS
GF

**Mitchell Shapiro**
**Greenamyre & Funt LLP**
881 Piedmont Ave NE
Atlanta, GA 30309

Georgia Attorney General Christopher Carr
40 Capitol Square SW
Suite 134
Atlanta, GA 30334

CERTIFIED MAIL

7021 2720 0002 6153 6479



---

Domestic Return Receipt

PS Form 3811, July 2020 PSN 7530-02-000-9053

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Christopher Carr
office of Attorney General
40 Capitol Square SW
Suite 134
Atlanta GA 30334

2. Article Number (Transfer from service label)

7021 2720 0002 6153 6479

9590 9402 8436 3156 5639 98

3. Service Type
□ Priority Mail Express®
□ Registered Mail™
□ Registered Mail Restricted Delivery
□ Signature Confirmation™
□ Signature Confirmation Restricted Delivery
□ Adult Signature
□ Adult Signature Restricted Delivery
□ Certified Mail®
□ Certified Mail Restricted Delivery
□ Collect on Delivery
□ Collect on Delivery Restricted Delivery
□ Insured Mail
□ Insured Mail Restricted Delivery (over $500)

A. Signature
X
□ Agent
□ Addressee

B. Received by (Printed Name)    C. Date of Delivery

D. Is delivery address different from item 1?    □ Yes
If YES, enter delivery address below:    □ No

FP
US POSTAGE
$011.54°
First-Class Mail
ZIP 30309
08/30/2024
0368 0011811141